In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1444

WILLIAM PRICE,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 13-cv-1160-CJP — **Clifford J. Proud**, *Magistrate Judge.*

ARGUED JULY 8, 2015 — DECIDED JULY 24, 2015

Before POSNER, SYKES, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* Price, who appeals from the deci-
sion of the district court upholding the Social Security Ad-
ministration's 2013 denial of his claim for Supplemental Se-
curity Income (benefits for low-income people who are aged,
blind or disabled, *Browning v. Colvin*, 766 F.3d 702, 703 (7th
Cir. 2014)), is an almost illiterate, mentally retarded ("intel-

lectually disabled" is the currently favored term, *id*.) 44-year-old who also suffers from psychiatric ailments. It appears that between 1988 and 2010 he received SSI benefits intermittently, but the record does not indicate what the basis for adjudging him disabled was. In fact the record is a mess, which does not reflect well on the Social Security Administration's ability to maintain records. All we know, so far as the past is concerned, is that he was adjudged disabled in 1988, 1991, and 2007, and that his benefits should have been terminated in 2005 because that year he was sent to prison for a felony sex offense and imprisonment for a felony automatically terminates entitlement to disability benefits, 20 C.F.R. § 404.468—a prison inmate doesn't need an income. Yet how then to explain the third disability award, made in 2007 yet listing a termination date of 2006—and he was still in prison in 2007. The confusion is hopeless.

There is no suggestion that the award of benefits in 1988 or 1991 was erroneous (and no explanation for why there were two awards) or that, had he not been sent to prison, his benefits might have been terminated on some other ground. This history creates a presumption that had it not been for his being sent to prison he would still be receiving the benefits stream that began in 1988.

Paroled in 2010, he forthwith applied for the same benefits that he had received before he entered prison, and being turned down sought judicial relief, culminating in his appeal to us.

Since his release from prison he has been under the care of a psychiatrist named Elbert Lee, who has diagnosed him with a major depressive disorder and antisocial personality disorder and has prescribed antidepressant and antipsychot-

ic medicine to treat these conditions. Price has told Dr. Lee that he's afraid of people and hears voices telling him that he's no good. Two psychologists after examining Price's file concluded that he takes great pains to avoid people (an example being that he shops for groceries at 1:00 a.m.), has made only a marginal adjustment to adult life, has a chronic mood disorder that manifests itself in depression, also has an anxiety disorder, an antisocial personality disorder and a learning disability, and his intellectual abilities are very modest—his only IQ score in the record is 65; an IQ below 70 is in the retarded zone. To top it all off he has an adjustment disorder (basically, going to pieces under stress). Yet the two psychologists thought that despite Price's mental and psychiatric problems he is capable of work-related activity. One said he can follow simple, repetitive instructions but would have difficulty with persistence in the workplace, the other that his mental capacity is equal to performing simple tasks. A third psychologist agreed with the other two. All three are retained by the Social Security Administration to determine whether an applicant for benefits has mental problems. Only one of the three examined Price, however.

The month after the psychologists' evaluation, Price may have tried to kill himself by overdosing on his antipsychotic medication. He said he wasn't trying to kill himself—that "he was having problems with sleep and he took too many to get sleep." But in the emergency room, to which he was taken to deal with the overdose, his (future) wife (at the time his girlfriend) said he'd told her it was a suicide attempt, and he was admitted to the hospital involuntarily. Dr. Lee, concerned with Price's condition, prescribed a variety of medications to treat his complaints of depression, paranoia, sleep problems, and hearing voices and thumping noises.

Attending counseling sessions at a behavioral health center, Price reported hearing voices (again), worrying that people would hurt him, and feeling like "less than a man" because he had "difficulty finding a job due to his criminal background and parole status." One of the counselors noted Price's "lack of motivation and hope, being tearful, [and] changes in sleeping and eating patterns."

Price had two more relapses after his may-have-been attempted suicide. Reacting to a threat by his wife (who also has mental illness, is described in the record as "mentally unstable," and like her husband has a criminal record) to leave him, he asked the counselor for "crisis intervention" and expressed "an overwhelming fear of what would happen to him." Several months later he called the police after arguing with his wife and asked to be taken to a hospital emergency room; they obliged him, but he was quickly discharged with instructions to see Dr. Lee.

Price made some progress toward minimal normality as a result of the medications that Dr. Lee prescribed for him. But Lee described the three relapses of the preceding year (mainly 2011) as "mental breakdowns" and opined that Price's mental problems would make him miss an average of three days a month from work were he employed—which would (the vocational expert at Price's hearing testified) disqualify him from gainful employment.

In counseling, Price reported having difficulty adjusting to life outside of prison—he said he'd been comfortable in prison because he had had a cell to himself and therefore hadn't had to interact with other people—and also reported leaving a Wal-Mart in which he was shopping "because he felt someone was going to hurt him there." A counselor who

is certified as a qualified mental health professional (like the counselor we mentioned earlier) noted Price's self-reported rating of the severity of his symptoms of mental disorder as 9.5 to 10 out of 10, which if accurate would tend to confirm the accuracy of the diagnoses of major depression, adjustment disorder compounded by anxiety and depression, and a learning disorder (presumably related to Price's very low IQ).

In the spring of the following year, 2012, Price had a fourth breakdown: after again arguing with his wife, he was found walking on the side of a highway. This dangerous activity somehow violated the terms of his parole, but although his parole officer reported that the violation was not serious enough to warrant revoking parole he had Price jailed for the next ten months "for [Price's] own well-being" because of his mental instability. Price didn't object to being jailed. He said: "I don't think I'll have any problems handling being here."

The acronym GAF ("Global Assessment of Functioning") refers to a scale of 1 to 100 used by mental health clinicians and physicians to help determine how well a person is doing in adjusting to the psychological and other challenges of living; the higher the score, the better he's doing. Criticized for subjectivity, the GAF is no longer widely used by psychiatrists and psychologists, but it was still in common use and frequently referred to in social security disability hearings during the period between Price's release from prison on parole in 2010 and his hearing before the administrative law judge in 2013, and the judge recited Price's scores. Remarkably, it may seem, when he was *not* in prison or jail his GAF scores were low (below 50), indicating poor adjustment. But

when he was jailed after the walk along the highway, his scores soared into the 50 to 68 range, which signifies only moderate difficulty in social or occupational functioning. This peculiar-seeming pattern was, however, consistent with Price's antisocial personality (and with his insouciance—another manifestation of that personality—about being jailed for the trivial parole violation), since jail or prison requires minimum socializing. After his release from jail his GAF score quickly plummeted to 33. A counselor noted that Price was withdrawn, made poor eye contact, and experienced hallucinations and paranoid delusions, and concluded that Price was schizophrenic and his intellectual functioning borderline.

One would think that such a combination of intellectual inadequacy and psychiatric abnormality would render a person incapable of gainful employment, and therefore totally disabled within the meaning of the social security disability statute and regulations. The administrative law judge, however, seconded by the magistrate judge, ruled that Price was not disabled. But the reasons they gave are unconvincing.

Cherry picking Price's GAF scores, the administrative law judge zeroed in on his scores between 50 and 68 and concluded that they showed that Price was recovering from his various mental ailments. The judge overlooked the fact that the high scores, because attributable to Price's being in jail, reinforced rather than undermined the diagnoses of antisocial personality disorder and paranoia. The judge ignored the plunge in Price's GAF score to 33 after Price was released from jail, where he had felt safe (a symptom of his antisocial personality disorder), and discredited Dr. Lee's

testimony on the ground that it was based on what Price had told him—and how could Price (whom the judge on scanty evidence described as "manipulative") be trusted? But psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings—a position we rejected in *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). Dr. Lee is reputable and based his testimony on Price's 23 visits to him over the course of two years. His professional training and experience would have taught him how to discount exaggerated statements by his patients.

The administrative law judge also discredited Dr. Lee's opinion on the ground that Lee's records showed that Price had improved with medication but that his opinion of Price's mental state failed to acknowledge those improvements. But Price's breakdowns during the course of his treatment by Dr. Lee were evidence that he did not improve significantly with medication.

Similarly off center was the administrative law judge's remark that "there is little evidence in the record from treating sources" to support Price's testimony that he has difficulty sleeping at night and as a result sleeps a great deal during the day. Price complained to Dr. Lee that he sleeps during the day, that his sleep cycle is reversed, and that his medication does not help him sleep; Dr. Lee believed him, and the administrative law judge had no reason to disbelieve him.

As is common in social security disability proceedings, the administrative law judge inferred from Price's ability to perform simple household chores, such as cooking food in a

microwave oven and mowing the lawn, that he could be gainfully employed. We've criticized casual inferences of ability to engage in gainful employment from ability to perform simple household chores, *Hughes v. Astrue*, 705 F.3d 276, 278–79 (7th Cir. 2013), noting that it's easier—especially for someone with an antisocial psychiatric disorder—to work in one's own home, at one's own pace, at one's own choice of tasks, than to work by the clock under supervision in a place of business. Moreover, one of the counselors rated Price's ability to prepare food and clean the house as "severely impaired" and another noted that Price's auditory hallucinations "interfere with his daily life and routine." Unsurprisingly, there is no evidence that he ever held a job when he was in prison or jail, and it has been many years since he had even sporadic employment.

The administrative law judge used Price's denial that he had overdosed in an attempt to kill himself as a reason to discredit him. Although attempted suicide by overdose is often a cry for help rather than a serious attempt to kill oneself, the fact that one overdoses on pills for reasons other than to kill oneself is not proof of mental stability, as the judge seemed to think. He also thought it telling evidence against Price that he'd sought psychiatric treatment "in part, to get help in getting disability [benefits]." There is nothing wrong with seeking such benefits, and when the benefits sought are for a psychiatric disability the applicant *must* visit psychiatrists or other mental health experts in order to build a case for benefits.

And finally the administrative law judge improperly belittled the gravity of Price's aversion to social interaction as a "not unreasonable" response to his spell on house arrest and

his being a sex offender. But house arrest cannot explain his decision to shop for groceries at 1:00 a.m. in order to avoid people, when he had been given permission to shop for groceries at any time of the day. And being a sex offender does not explain why Price suffered from auditory hallucinations before he was convicted of a sex offense.

The magistrate judge essentially just summarized the administrative law judge's findings, but made an unforced error when he said that the administrative law judge's "detailed discussion of Dr. Lee's records" included a reference to a statement by Dr. Lee "that plaintiff had three episodes of decompensation [mental breakdown] in the last fourteen months, *an assertion which is clearly not supported by his records*" (emphasis added). No, the records report the three breakdowns, which are three of the four that we noted earlier in this opinion. What the administrative law judge had said was that Dr. Lee's records did not show repeated and extended episodes of decompensation that would lead to an automatic finding of disability. He rightly did *not* cite this as a basis for giving Dr. Lee's opinion little weight, because the form that Lee had filled out concerning Price's condition asked just for the number of episodes of decompensation, not how long they lasted.

The unavoidable conclusion is that the judgment of the district court must be and it therefore is reversed with directions to remand the case to the Social Security Administration for reconsideration of its denial of SSI benefits to Price.