In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3883

MIKEAL G. COLE, JR.,

*Plaintiff-Appellant*,

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:14-cv-00198-RLM-SLC — **Robert L. Miller, Jr.**, *Judge*.

ARGUED JULY 6, 2016 — DECIDED JULY 26, 2016

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. In this appeal from the district
court's affirmance of the Social Security Administration's
denial of social security disability benefits, Mikeal Cole, a
41-year-old man who has severe pain in his arms and groin
and multiple gastrointestinal conditions as well, argues that
the administrative law judge assessed his credibility errone-
ously and failed to offer a reasoned basis for rejecting a con-

sulting physician's medical opinion. Recently the Social Se-
curity Administration announced that it would no longer
assess the "credibility" of an applicant's statements, but
would instead focus on determining the "intensity and per-
sistence of [the applicant's] symptoms." Social Security Rul-
ing 16-3p; "Titles II and XVI: Evaluation of Symptoms in
Disability Claims," 81 Fed. Reg. 14166, 14167 (effective
March 28, 2016). The change in wording is meant to clarify
that administrative law judges aren't in the business of im-
peaching claimants' character; obviously administrative law
judges will continue to assess the credibility of pain *asser-
tions* by applicants, especially as such assertions often cannot
be either credited or rejected on the basis of medical evi-
dence.

In 2000, while working as a welder, Cole broke his left
arm and wrist, requiring insertion of a metal plate and
screws in his arm. As a result of the accident and treatment,
he experienced pain that has still not gone away. Eight years
later, employed as a foreman in a factory, he fell off a 10-foot
ladder, landing on his right elbow. He experienced severe
pain in his right arm and in two of his fingers—
unsurprisingly, since he weighs about 185 pounds, which
would be bound to make a 10-foot fall onto a hard surface
likely to cause serious injury. He received physical and oc-
cupational therapy for the treatment but as with his previous
accident the pain has persisted.

The therapy having failed, Cole was examined by an or-
thopedic surgeon named David Cutcliffe, who diagnosed
cubital tunnel syndrome, a condition in which the ulnar
nerve—which runs down the inner side of the arm, behind a
bony prominence on the inner side of the elbow, to the hand,

supplying sensation to the muscles of the forearm and hand—is compressed at the elbow (the location of the inaptly named "funny bone"), causing pain, tingling, and numbness. Cutcliffe performed an anterior ulnar nerve transposition on Cole, a procedure that moves the ulnar nerve to a position in which it isn't irritated or pinched by the bony prominence. But the operation seems not to have been successful, as two months later Cole told Cutcliffe that despite continuing therapy his pain was worse than before and that he was coping by "eating pain pills." His elbow joint was producing a loud "pop" when he extended his arm, causing "significant pain"; he also experienced pain when his arm was fully bent at the elbow.

Another orthopedic surgeon, Ward Hamlet, gave Cole a diagnosis of posterolateral rotatory instability, a condition in which the elbow slides in and out of its joint because of an injury to the soft tissue on the outside of the elbow. He replaced the ligament in Cole's elbow with a graft from Cole's arm, yet months later Cole reported that he now had "constant pain in the elbow." Hamlet opined in a 2009 report that Cole's pain "would improve with time." Another orthopedic surgeon who examined him that year, Thomas Kay, noted his "chronic pain" but said "that much of his discomfort will continue to improve over time" and that he could return to work "without restrictions." Neither optimistic prediction seem to have been accurate. Hamlet acknowledged that Cole was "pretty frustrated" by his continued pain but said "I have told him I do not think there is anything else we can do for him surgically or nonsurgically."

That same year, having tried without success to obtain employment since his fall off the ladder, Cole settled his

worker's compensation claim against his former employer and obtained unemployment benefits. They ran out the next year and it was then that Cole applied for social security disability benefits, claiming that his disability had begun with his fall off the ladder. A further round of medical examinations ensued. An internist named Gautham Gadiraju, a state-agency consulting physician, noted that Cole had muscle pain and abnormal joint movement in the right elbow and left wrist and experienced severe pain when gripping with his right hand, which had limited strength. Gadiraju determined that Cole could carry 20 pounds a distance of 30 feet and could lift 10 pounds above his head with his left hand but not with his right hand, and that he could sit or stand for only 30 minutes at a time and walk for no more than 6 minutes at a time. If this is correct, Cole is indeed disabled from gainful employment.

Another state-agency consultant, however, family physician D. Neal, inferred from Cole's records (he didn't examine Cole) that Cole could stand or walk for 6 hours in an 8-hour workday, occasionally lift 20 pounds and frequently 10, and engage in unlimited pushing and pulling. But subsequently another family physician, Charles Coats, examined Cole and concluded contrary to Neal that he couldn't "carry out normal activities," and that while he had good grip strength he also had forearm pain, a limited range of motion in his elbows, and "significant" limitations with respect to lifting, grasping, and manipulation; pushing and pulling; and crawling, climbing, and reaching above the shoulders. Finally, two psychologists, Michelle Croce and Neal Davidson, diagnosed Cole with depressive disorder and gave him a Global Assessment of Functioning (GAF) score of 58, which is predictive of "occasional panic attacks" or "moder-

ate difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). We should note, however, that DSM-5, issued in 2013, abandoned reliance on GAF scores. See *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir 2015).

During this period (2011–2012) Cole occasionally visited a free clinic for treatment of his arm pain and of a new onset of stomach problems, and was given an exercise program and prescribed drugs to treat inflammation and neuropathic symptoms (such as loss of sensation in the skin owing to nerve damage). A CAT scan of his abdomen and pelvis, ordered after he had started experiencing abdominal pain and spitting up blood, which was also showing up in his stool and urine, revealed that a lymph node in his groin was "mildly enlarged" and several of the lymph nodes in his abdomen were "borderline in size." Further testing revealed gastritis (inflammation of the stomach lining), duodenitis (inflammation at the beginning of the small intestine), left inguinal lymphadenopathy (an enlarged lymph node in the groin), and H. pylori (a bacterial infection in the stomach, which seems however no longer to be bothering Cole). And finally a vocational expert named Christopher Young hired by Cole to review his medical record reported that "there is no work that Mr. Cole would be able to perform at any exertional level."

Which brings us to his hearing before the administrative law judge in mid-2012. Cole testified that the constant pain in his arms interfered with his sleep and that he had slept a total of only 10 hours the previous week (which is obviously false, but his pain and other medical problems may have

produced mental confusion). He said that he played guitar occasionally for money but could do so only once a week and only for about an hour at a time, because *any* activity with his arms causes numbness in his hands. He said that the swollen lymph node in his groin had been causing him terrible pain for two or three years, that as a result he can't sit for prolonged periods, and that the drugs he's taking (including Tramadol, Vicodin, and Neurontin) alleviate his arm and groin pain only slightly.

The only other witness was a vocational expert employed by the Social Security Administration who testified that a person with Cole's limitations could perform unskilled jobs requiring light exertion. Specifically, a person capable of completing simple tasks in a timely manner, lifting 20 pounds occasionally and 10 pounds frequently, standing, walking, or sitting for 6 hours in a workday, frequently climbing ramps and stairs, balancing, stooping, and kneeling and occasionally reaching overhead and handling with the right hand, could work as a rental consultant, usher, or bakery production worker. He testified that Cole, if capable of lifting 10 pounds only occasionally but fewer pounds frequently, of standing or walking for 2 hours in a workday and of sitting for 6 hours in a workday, could work as an order clerk, a telephone clerk, or a surveillance monitor. But given Cole's background as a manual laborer, there is nothing to suggest that he could be a rental consultant, and his infirmities seem likely to preclude his being a bakery production worker as well, while given his problems with his arms it is unclear that he could work as any kind of clerk; nor does he seem capable of the long hours and concentration required of a surveillance monitor. These issues were never explored.

After the hearing but before the close of the record and the decision by the administrative law judge, Cole was directed by the judge to undergo further medical examinations. An internist named Barbour who examined Cole reported that his "musculoskeletal problems" and "left groin swelling" were "chronic" and interfered "with all daily activities," that his arm condition was unlikely to improve, and that the pain in his groin limited him to sitting, standing, or walking for only one hour in a work day. Obviously if that's correct he's totally disabled from gainful employment.

A urologist named George Martin reported that the lymph nodes in Cole's groin, although they had decreased in size, were "still painful," as were the lymph nodes in his armpits. An internist named Shashank Kashyap reported that Cole complained of back, joint, and muscle pain, as well as muscle weakness and swelling of the joints, but that he (Kashyap), on the basis of clinical tests that he performed, such as asking Cole to bend his arm or move his legs, did not observe muscle weakness or joint swelling or other indicia of pain. Kashyap did not however try to reconcile Cole's complaints with the clinical evidence, and so he did not say that Cole was exaggerating his symptoms. One would need to know more about the clinical tests to explain the contradiction between what Cole said and how Kashyap read the test results.

And finally Daniel Roth, a doctor of osteopathic medicine specializing in physical medicine, rehabilitation, and pain management, opined that Cole's multiple physical traumas and surgeries rendered him "disabled and currently unable to maintain meaningful employment."

Nevertheless the administrative law judge denied Cole's application for disability benefits—primarily on the odd ground that the "timing of his filing appear[ed] to coincide with when his unemployment benefits were running out," which the administrative judge said "suggests that it was economic need, not disabling medical conditions, that prompted" Cole to apply for benefits. That doesn't make sense. When receiving unemployment benefits Cole didn't need disability benefits, and probably wouldn't have expected to be allowed to receive both types of governmental benefits at once, as receipt of unemployment benefits would imply ability to work. Unemployment benefits are generally given only to those registering as unemployed, and often on conditions ensuring that they seek work and do not currently have a job. Furthermore, we explained in *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), that people often are "reluctant" to apply for benefits and "undergo arduous administrative proceedings" until driven to do so by "desperation resulting from a personal crisis" or "the cut off of other public funds." The presence of economic need is hardly inconsistent with having a disability; indeed the two go hand in hand.

The administrative law judge also thought her decision that Cole's application for disability benefits had not been based on a disability further supported by the fact that Cole had "essentially had no treatment" between July 2009 and May 2011. The implication is that he must have felt fine during this period, but the administrative law judge should have asked him why he had had essentially no treatment during that period. See *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013); 81 Fed. Reg. 14166, 14168–71. In fact he had no health insurance then, which may explain why he didn't

seek treatment. Or he may have accepted Hamlet's conclusion that further treatment would not have helped. See 81 Fed. Reg. 14166, 14168–71. The administrative law judge should also have explained the force of "essentially" in her statement.

She appears to have thought Cole a malingerer, who could have gone back to factory work or obtained some other type of strenuous manual labor but preferred to sit on his fanny living off governmental largesse. But he did of course go back to work after his first (2000) accident, only to have a second accident in 2008. He had a work record going back some years before his first accident and including strenuous jobs between his first and second accidents, and we have said that "a claimant with a good work record is entitled to [a finding of] substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

The administrative law judge further concluded that Barbour's opinion about Cole's capacity for work was "entitled to no weight" because the limitations noted by Barbour were "based on the claimant's report." But what did she expect? That Barbour would bend Cole's arm back until he screamed with pain? True, there are subtler medical tests for pain, such as a tap on the elbow, where the ulnar nerve is close to the surface. The result of Barbour's tests, however, was to confirm tenderness and swelling in the groin area, that Cole couldn't hop or squat, and that his right elbow flexion was 130 degrees—which is about fifteen degrees below normal—and his right grip strength 2/5. Furthermore, "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on

his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.'' *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015).

The administrative law judge also rejected Barbour's clinical findings as inconsistent with Coats's exam, which had "showed reduced range of motion of both [of Cole's] elbows, but normal power grip of five out of five and good coordination." Yet the administrative law judge had pronounced Coats's assessment of Cole's condition "internally inconsistent" and thus entitled to no "significant weight." The administrative law judge further stated that Barbour's report was inconsistent with the results of Kashyap's exams in 2012, which "were essentially normal." But this ignored the tension in Kashyap's report noted earlier in this opinion between the pain that Cole reported to him and the results of Kashyap's diagnostic tests, results inconsistent as we just noted with Barbour's report. By relying on the reports of Coats and Kashyap to discount Barbour's opinion, the administrative law judge was cherry picking the medical record—which is improper. See *Price v. Colvin*, 794 F.3d 836, 839–40 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

The administrative law judge's decision was unreasoned, and should not have been affirmed. The judgment of the district court is therefore reversed with instructions to remand the case to the Social Security Administration for reconsideration of the plaintiff's application for disability benefits.