NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 11, 2018
Decided January 4, 2019

**Before**

DIANE P. WOOD, *Chief Judge*

KENNETH F. RIPPLE, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 18-1654

| | |
|---|---|
| JACQUELYEN DERRY,<br> *Plaintiff-Appellant,*<br><br>  *v.*<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security<br> *Defendant-Appellee.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 16-cv-11434<br><br>Susan E. Cox,<br>*Magistrate Judge.* |

**O R D E R**

Jacquelyen Derry is a 49-year-old woman who suffers from several trauma-related mental health conditions—posttraumatic stress disorder (PTSD), generalized anxiety disorder, military sexual trauma, panic disorder, and major depressive disorder—as well as severe migraines. She is seeking disability insurance benefits from the Social Security Administration. Thus far, however, her efforts have failed. An administrative law judge held a hearing and rejected her claim, and the Appeals Council declined to intervene. Derry contends that the ALJ improperly disregarded both key physician assessments and the finding of the Veterans' Administration that

she is disabled. We agree with her that substantial evidence does not support the agency's conclusion, and so we remand for further proceedings.

**I**

Derry served in the U.S. Navy from 1988 until September 30, 2010, achieving the rank of E-7, Dental Tech Chief Petty Officer. In 2007, her supervising officer at the Great Lakes Naval Station began sexually harassing her. After she rejected his advances and reported his conduct, she was moved to another work area. But she struggled to adjust to the culture there. As a result of her problems in the workplace, she developed migraines and had trouble sleeping. In June 2009, her new supervisor accused her of dereliction of duty for leaving her post to get feminine hygiene products for her irregular menstrual bleeding. She was brought to a conduct board of six "master chiefs" who verbally abused and humiliated her. Shortly after, in August 2009 (just before her alleged disability-onset date), Derry was admitted to a psychiatric hospital for five days. Doctors there diagnosed her with depressive disorder and migraines related to her work environment.

In September 2010, Derry accepted an honorable discharge from the Navy because of her medical conditions. After her discharge, a VA doctor diagnosed her with major depressive disorder, recurrent; PTSD; and military sexual trauma. Dr. Laura Sunn treated Derry for her mental illnesses from March 2011 to November 2012, when Dr. Sunn left the VA clinic. Dr. Sunn noted that Derry had trouble concentrating and limited short-term memory. Although Derry was coherent, logical, and cooperative, Dr. Sunn documented the following impairments: depression; errors on serial sevens (*i.e.* counting backward from 100 by sevens); slow speech; psychomotor retardation; and a downtrodden and subdued appearance. Dr. Sunn stated that Derry was "so[] impaired that she cannot seek work and it is unlikely that she could concentrate long enough to complete tasks." Dr. Sunn continuously reported that Derry's mental status and ability to function were unchanged.

Derry also began seeing a VA therapist, Lisa Storie, in early 2011. Storie noted later that year that Derry was doing better. But in September 2011, Derry was isolating herself and was not taking care of herself; this continued into December. Storie, Dr. Sunn, and other providers continued throughout 2012 to report similar findings: such reports appear at no less than 15 places in the record. (Administrative Record 330, 405, 433–34, 441, 553, 649, 846, 849, 858, 893, 914, 929, 931, 985, 992.) At times Derry showed improvements, but at other times she missed appointments because, according to Dr. Sunn, her mental conditions made it hard for her to leave the house. Derry's new

psychiatrist, Dr. Corrine Belsky, diagnosed Derry with panic disorder in December 2012.

Derry's migraines with aura continued after she left the Navy; by early 2011, she reported having them twice a week. She continued to receive treatment for them throughout 2012. In July 2012, neurologist Dr. Hien Dang documented that most medications did not help Derry's migraines. Dr. Dang ordered an MRI. The initial and follow-up MRIs showed signs of lesions "consistent with migraine headaches." Derry began therapeutic botulinum toxin injection treatment. Dr. Dang noted that this treatment helped but that additional medicine also was needed. In November 2012, Dr. Dang found Derry too dizzy and lightheaded to undergo her scheduled treatment and sent her to the emergency department instead.

From February to June 2013, the medical records showed a gap in treatment. In June, Derry saw her doctors for worsening migraines. In July 2013, Dr. Belsky wrote that Derry had been in Florida "caring for her mom" for six months and felt "better." (When the ALJ asked Derry about this, she testified that her family had brought her home, and her mother was sick with bronchitis while she was there.) Dr. Belsky also reported, however, that Derry was still having panic attacks twice a week and frequent nightmares. Several times, Derry's family members in Florida drove to Illinois to bring her home and care for her, at one time because she had suicidal thoughts.

Derry applied for social security disability benefits in 2013. She underwent state-agency evaluations in connection with her application. Dr. Julia Kogan diagnosed Derry with depression. Dr. Gregory Rudolph found that she experienced PTSD symptoms; presented vegetative symptoms; was oriented to reality; had intact memory skills; was able to use judgment and reasoning skills; exhibited a depressed mood level; and had a limited prognosis and insight. Dr. Russell Taylor completed a remote consultative examination by video feed. He concluded that Derry could understand simple and detailed instructions; sustain concentration and persist well enough to carry out simple tasks for a normal work period; make work-related decisions; interact and communicate sufficiently in a work setting with reduced social/interpersonal demands; could not continuously interact with the public; and could adapt to simple, routine changes and pressures. In May 2014, Dr. Thomas Low performed a remote consultative examination and agreed with Dr. Taylor's findings.

In October 2013, Derry underwent evaluations to determine her Navy pension and benefits. Neurologist Dr. Robert Hazelrigg examined Derry in person and found that she had "very frequent characteristic prostrating and prolonged attacks of migraine headache pain," citing her medical records and the two MRIs. He concluded that her

headache condition diminished her ability to work. Dr. Brian Lipson also reviewed medical records and examined Derry, observing that her major depressive disorder and PTSD symptoms had increased since her previous evaluation in 2010. He opined that Derry's depressive disorder, migraine headaches, and PTSD rendered her unable to secure and maintain substantially gainful employment. Dr. Mark Aghakhan examined Derry and reviewed her "documentation and reported symptomology"; he found that she demonstrated average insight, unimpaired judgment, but that she showed extensive symptoms of PTSD and depression. Dr. Aghakhan opined that Derry's mental impairments had increased since her 2010 exam, and her depressive and PTSD symptoms affected her functioning. The VA determined that Derry was disabled and unable to secure or follow substantially gainful employment.

Derry continued to see Dr. Dang for migraines throughout 2013. In November 2013, Dr. Dang again sent Derry to the emergency department for severe symptoms. Dr. Dang noted that while therapeutic injections helped, her "chronic recurrent migraine[s]" were "refractory" to medications.

Throughout 2014, Derry' new therapist, Andrea Fafford, and psychiatrist Dr. Patricia Zaror both noted that Derry had full insight and intact judgment but also documented persistent symptoms of depression, military sexual trauma, and PTSD—neurovegetative symptoms, distorted thinking and perception of events, psychomotor retardation and agitation, and sleeping during the day. Fafford noted that Derry still had difficulty prioritizing specific objectives; her thinking was distorted; and she was not able to change too many things at once because her low stress tolerance caused "overwhelming and sabotage"—an assessment that Fafford repeated many times. In June 2014, Derry told Fafford that she had not moved to Florida to be with her family only because her trust issues made her fearful of leaving her medical providers and having to start over.

In early 2015, Derry went to Florida but kept in touch with Fafford. When she came back, Dr. Zaror noted that Derry "said that being [with] her family, walking, biking makes her happy." Derry was still "sleeping a lot." The psychiatrist recorded that Derry exhibited psychomotor retardation and a constricted affect. Throughout 2015, Fafford assessed no improvements in Derry's mental state.

## II

Derry applied for social security disability benefits on May 14, 2013. Her application was initially denied, and so she requested a hearing. See 20 C.F.R. § 404.929. At the hearing, she testified about her physical and mental health problems and the limitations they caused. Derry denied that she participated in any of her former

activities, such as luncheons, walking at the mall, or church. The ALJ asked about a psychiatrist's note reporting that Derry liked walking and biking in Florida, but Derry denied that she had biked in the last four or five years.

Next, the vocational expert testified that jobs existed in the national economy for a hypothetical person such as Derry who, according to the ALJ, retained the residual functional capacity (RFC) to perform light work consistent with mild limitations for daily functioning and moderate limitations for social functioning and concentration, persistence, and pace. But he also stated that such a person would not be able to sustain competitive work if she missed two days a week on account of migraines or difficulties with motivation, nor if she were off task 15% of the time or needed additional breaks to lie down.

The ALJ concluded that although Derry had severe impairments, she was still able to perform certain work and thus was not disabled. In coming to that conclusion, the ALJ dismissed the opinions of treating psychiatrists Dr. Sunn and Dr. Zaror and did not even discuss how she weighed the opinions of other treaters, such as the therapists and Dr. Dang. The ALJ also disregarded the VA's disability rating, because she thought it relied too heavily on subjective reports and was unsupported by the medical records and gaps in treatment. She said the same of Dr. Lipson's opinion. As for Drs. Aghakhan and Hazelrigg, the other two VA pension examiners, the ALJ found overall support for the former's opinion but questioned whether Aghakhan had reviewed the entire record, and considered Hazelrigg's opinion vague. The ALJ gave the agency's consultative examiners' opinions greater weight because they specifically addressed each of Derry's functional capacities and were, in the ALJ's view, consistent with the medical evidence.

Last, the ALJ concluded that Derry's impairments could reasonably be expected to produce the reported symptoms, but (using language about "credibility" that the Social Security Administration has eliminated from its regulations, see Social Security Ruling 16-3P) her statements about their intensity, persistence, and limiting effects were not "entirely" credible. The ALJ believed that Derry minimized her efforts to go to college and had not mentioned sleeping during the day to her providers. Derry's trips to Florida, the ALJ thought, showed that she was not severely impaired.

## III

This court reviews the ALJ's decision *de novo*, upholding it if it is supported by substantial evidence. Derry contends that the ALJ improperly accorded little weight to the medical opinions of her VA physicians, who treated her for several years. She argues that the medical records support those opinions and correspond with the reported intensity and frequency of her symptoms.

We agree with Derry that the ALJ failed properly to explain why she rejected the opinion of Dr. Sunn, who treated Derry at length. Under the regulations in effect at the time of the ALJ's decision, a treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). An ALJ must give more weight to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, and (5) offered opinions consistent with objective medical evidence and the record as a whole. *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)(i), (ii)). All of these factors support giving significant weight to Dr. Sunn's opinion that Derry was too impaired to seek work or complete tasks. See *id.*

Indeed, the ALJ's opinion is confusing in its treatment of Dr. Sunn. Although the ALJ acknowledged that Dr. Sunn was a longitudinal specialist, the ALJ also stated that Dr. Sunn's opinion was a "snapshot" of Derry's functioning rather than a "longitudinal, function-by-function assessment" supported by the record. The "snapshot" observation has no basis in the record. In fact, Dr. Sunn's treatment and examination records for the period from March 2011 to November 2012 support her assessment of Derry's functional limitations. We have described those records in detail above and see no reason to repeat them here. Dr. Sunn consistently reported that Derry's mental status exam was unchanged or worse. The ALJ did not account for objective observations confirming the severity and persistence of Derry's depression, PTSD, and military sexual trauma. Nor did the ALJ explain why or how Dr. Sunn's assessment was not "consistent with objective medical evidence and the record as a whole." See *Roddy*, 705 F.3d at 637. She also failed to explain why Dr. Sunn's 20-month course of treatment deserved less weight than the opinions of consultative examiners who each interacted with Derry one time over a video feed.

The ALJ also improperly disregarded Dr. Zaror's opinion that Derry suffered "paralyzing" migraines, stating without any elaboration that Dr. Dang's treatment records did not support this characterization. The record, once again, is definitively to the contrary. Dr. Dang twice brought Derry to the emergency room because her migraines were too acute for him to treat during a regular office visit. His entire treatment record reflects positive diagnostic testing and aggressive treatment of migraines. And during the pension review, Dr. Hazelrigg, the VA neurologist, reviewed Dr. Dang's treatment records and the MRIs and opined that Derry suffered "very frequent characteristic prostrating and prolonged attacks of migraine headache pain." The ALJ's failure to address the medical evidence corroborating Derry's subjective

complaints and Dr. Zaror's assessment amounts to "cherry picking the medical record." See *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016).

The ALJ also failed to explain why she gave the VA's disability rating such little weight. Even though the VA's evaluation of disability gives the benefit of the doubt to the claimant, a VA rating that a claimant's impairments prevent her from engaging in substantially gainful employment is "practically indistinguishable" from the Social Security Administration's disability determination. See *Bird v. Berryhill*, 847 F.3d 911, 913 (7th Cir. 2016). The ALJ said the VA's rating was of "limited evidentiary value" because it was inconsistent with records of "primarily normal objective physical and mental findings," but she did not point to any of these "normal" findings, and so there is no way to know what medical records she believed conflicted with the VA rating.

Also troubling are some leaps of logic the ALJ made that are difficult to justify. For example, she discounted Dr. Hazelrigg's opinion about Derry's migraines affecting her ability to work because "her station and gait were normal." The connection between those factors and the migraines is nowhere explained. The years of treatment notes documenting Derry's severe depression and PTSD meant little to the ALJ because Derry had "good hygiene, [and was] cooperative, polite and alert." Again, that supposed conflict is unexplained. The ALJ's failure appropriately to account for the VA's disability determination and the medical opinions supporting it (*e.g.*, those of Drs. Aghakhan, Lipson, and Hazelrigg) requires a remand. See *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015).

Yet another problem lies in the ALJ's failure logically to connect the evidence in the record to her determination of Derry's mental RFC. As discussed above, the ALJ erroneously analyzed the medical record. She also relied on incorrect information. In rejecting Derry's statement that she sleeps most of the day, for example, the ALJ stated that Derry never reported this degree of impairment to her examiners or treatment providers. The record is otherwise. Derry told numerous different providers throughout the years that she stays in bed most of the day. Dr. Zaror also documented that Derry presented neurovegetative symptoms of trouble sleeping at night. This evidence could support limitations on daily functioning and concentration, persistence, and pace, but the ALJ did not consider it.

The RFC determination was further marred when the ALJ set an impractically high and legally incorrect bar for establishing disabling mental illness. See *Voight v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015). The ALJ stated that Derry had only moderate difficulties in social functioning because she had no history of being fired for not getting along with others and had no history of multiple arrests or incarcerations. Where that

standard came from is a mystery. Moreover, the ALJ overlooked evidence that Derry does have trouble interacting with other people. The treatment records show that Derry had conflicts with her supervisors resulting in discipline, and her 2009 hospitalization was partially because of these conflicts. And the ALJ did not discuss any of the medical evidence showing that Derry has trouble trusting others and processing change, and that she experienced social anxiety and tended to isolate herself because of her childhood and military sexual trauma. The ALJ should have explained why this evidence mattered less than the fact that, in 22 years of Navy service, Derry was never fired, arrested, or incarcerated and achieved the rank of Chief Petty Officer. See *Craft v. Astrue*, 539 F.3d 668, 676–78 (7th Cir. 2008).

The ALJ also undercut the severity of Derry's problems with concentration, persistence, and pace without discussing most of the relevant evidence, primarily from Derry's treating physicians. Derry's providers repeatedly noted her concentration problems, her difficulty completing tasks and goals, and her distorted thinking and perception. The ALJ was required properly to reconcile this evidence with her own thinly supported conclusions about Derry's residual functional capacity. See *Clifford v. Apfel*, 227 F.3d 863, 873–74 (7th Cir. 2000).

The ALJ's adverse credibility determination suffers from the same flaws of overlooking or misstating parts of the medical record and giving, without proper explanation, dispositive weight to the opinions of consultative doctors over treaters. Further, the ALJ discounted Derry's reported mental limitations by stating that Derry tried to minimize that she went to college, but the ALJ was silent about the fact that Derry received a disability accommodation and was unable to complete her original program. Moreover, Derry's mere "*desire* to work"—or attend school—"is not inconsistent with her *inability* to work because of a disability." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (emphasis in original). The ALJ also does not explain why she interpreted Derry's trips to Florida as evidence that she was capable of work, rather than as reflecting her family's belief that she needed to be in their care.

## IV

Because the ALJ provided inadequate explanations for rejecting the VA's disability rating and the opinions of Derry's treating physicians, while neglecting to address substantial evidence contrary to her conclusion, we VACATE and REMAND for further proceedings.