NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 23, 2019
Decided February 15, 2019

**Before**

DIANE P. WOOD, *Chief Judge*

MICHAEL S. KANNE, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 18-2166

| | |
|---|---|
| CATHY M. FISHER, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District |
| | of Indiana, Lafayette Division. |
| *v.* | |
| | No. 4:16-cv-66 |
| NANCY A. BERRYHILL, Acting | |
| Commissioner of Social Security, | Joseph S. Van Bokkelen, |
| *Defendant-Appellee*. | *Judge*. |

**O R D E R**

Cathy Fisher is a woman in her late 50s who suffers from a long list of chronic conditions. She has been seeking disability insurance benefits since 2014, so far unsuccessfully. In this appeal, she challenges the district court's decision to uphold the adverse decision of the Social Security Administration on her claim. That decision was flawed, she contends, because the administrative law judge improperly discounted the opinions of her treating physicians and her own testimony in support of her claim. We

agree with her that it is impossible to follow the ALJ's reasoning, and so we must remand for further proceedings.

**I**

Although Fisher's alleged onset date is March 13, 2014, it is helpful to begin the story a couple of years earlier. In June 2012, Fisher complained to Dr. Tamara Hazbun, her primary care physician, that she had experienced abdominal cramping for three weeks. An ultrasound revealed hepatic steatosis (alcohol-related liver disease) but no other internal abnormalities. Fisher visited Dr. Hazbun again in July 2012, reporting abdominal pain, unintentional weight loss, and fatigue. Dr. Hazbun referred Fisher to Dr. Ikenna Egbuna, a gastroenterologist, for her abdominal pain. A colonoscopy and EGD (a scope through Fisher's esophagus) "showed gastritis" (an inflammation of the stomach lining caused by the same bacteria that causes stomach ulcers). Dr. Egbuna prescribed omeprazole and recommended that Fisher return in three months for liver-function tests and a possible biopsy if her symptoms persisted.

Although Fisher's abdominal pain lessened and her weight stabilized, she returned to Dr. Hazbun in August 2012 complaining of right hip pain that nearly caused her to fall at work. At the time, Fisher was a chemical mixer at Cook Biotech, where she frequently lifted 15-pound buckets and spent 4 hours per day on her feet. Dr. Hazbun referred Fisher to Dr. Peter Seymour (whose specialization does not appear in the record). He diagnosed her with right-hip degenerative arthritis and prescribed physical therapy.

Less than two weeks later Fisher fell and injured her right foot. She told her physical therapist that her pain ranged from 2 to 5 out of 10 and that her hip would "lock[] up" between two and four times daily. The physical therapist listed Fisher's long-term goals: "to tolerate squatting/kneeling/forward bending" and "achieve … 6 hours sleep without waking [because of] pain."

In September 2012 Fisher reported to Dr. Hazbun that her abdominal pain, nausea, weight loss, and fatigue had returned. Dr. Hazbun scheduled a series of referrals and tests and opined that Fisher would require 1 to 8 hours of leave per week under the Family Medical Leave Act for "doctor app[ointment]s related to abdominal pain and abnormal labs." Fisher tested positive for lymphadenopathy (inflamed lymph nodes) and splenomegaly (an enlarged spleen).

More than that, biopsies of her skin, muscle, liver, and spine showed that Fisher now had sarcoidosis, a chronic inflammatory condition in which granulomas (collections of inflamed cells) grow on organs and tissues and may impede functioning. Experiencing painful abdominal swelling and unable to eat or to sleep, Fisher quit working in October 2012.

When Fisher reported numbness in her legs that caused her to stumble and fall, Dr. Hazbun referred her to Dr. Malarvizhi Natarajan, a rheumatologist, to evaluate whether her sarcoidosis had reduced her muscular functioning. Dr. Natarajan noted that Fisher's symptoms suggested "systemic sarcoidosis … causing weakness," and possible neuropathy related to her preexisting diabetes.

By January 2013, Fisher's muscle weakness was not as serious, but her abdominal pain had worsened. Dr. Hazbun extended Fisher's FMLA leave through March and began treating her abdominal pain with an immunosuppressant. In March and early May 2013 Fisher told Dr. Natarajan that the new drug alleviated her pain.

But her relief did not last for long. In late May she visited the emergency room, again reporting abdominal pain. A doctor opined that "muscle strain" could be the cause. In June, Fisher reported "sharp pain" when she bent forward. In July 2013, Fisher told Dr. Natarajan that she felt pained, dizzy, fatigued, and nauseated. And Dr. Hazbun noted in September that Fisher's sarcoidosis was "flaring" and her diabetes was "uncontrolled." Dr. Hazbun also detected an infected lump in Fisher's groin that made it painful for her to sit or walk; he ordered immediate surgery to remove it. Fisher later visited the emergency room and reported that she was experiencing shortness of breath when she exerted herself. At some point she fell on the stairs in her home.

In November 2013, Fisher continued to complain of leg weakness, but she reported that her pain and shortness of breath had largely abated. Fisher again met with a physical therapist, who noted in December 2013 that Fisher complained that her nerves had been affected by her sarcoidosis. Fisher's physical therapy goals, moreover, were "to tolerate prolonged standing … greater than or equal to 30 min [*sic*]" without "giving out." Fisher also wanted "to tolerate squatting/kneeling" so that she could care for her five-month-old grandchild. Dr. Natarajan opined in January 2014, however, that Fisher "could not continue" with her physical therapy regularly.

Disability benefit applicants must identify an "onset" date, and as we noted, Fisher pinpointed March 13, 2014, because that was when she stopped working because of shortness of breath. Just before that date, she complained to Drs. Hazbun and

Natarajan of swelling and radiating pain in her hands, arms, feet, and ankles that woke her up at night and left her constantly fatigued. Dr. Hazbun "suspect[ed] a flare of sarcoidosis" and opined that "it may be wise for her to stop working and go on disability." Dr. Natarajan also referred Fisher to Dr. Cheng Du, who conducted an electromyographic examination in March 2014 to test Fisher's nerves. Dr. Du diagnosed Fisher with "[m]ild carpal tunnel syndrome" in her right hand and "minimal sensory neuropathy," related to her diabetes, in her right leg. Dr. Du also noted that Fisher reported that her "hand tingling" had improved since she stopped working.

## II

Fisher's application for disability insurance benefits under the Social Security Act alleged that her sarcoidosis, depression, diabetes, and high blood pressure left her disabled and unable to work beginning no later than March 13, 2014. She also applied for, and received, unemployment benefits for the second through fourth quarters of 2014.

The agency determined that Fisher was not disabled and denied her application. Dr. J.V. Corcoran, a state-agency physician, reviewed Fisher's records and determined that Fisher could occasionally lift 50 pounds, frequently lift 25 pounds, and walk for up to six hours. With those abilities, he said, she was capable of "medium" work. Another agency reviewing physician, Dr. Jerry Smartt, Jr., also completed a Residual Functional Capacity assessment. He concurred that Fisher could perform medium work, lift up to 50 pounds, and stand for up to six hours daily.

When Fisher's abdominal pain flared up in June 2014, doctors debated its cause. Dr. Natarajan suspected nerve damage from her sarcoidosis and diabetes. Dr. Egbuna attributed Fisher's pain to gastritis and so prescribed sucralfate, an ulcer drug. Dr. Scott Gabbard of the Cleveland Clinic suggested that some other neuropathy—but not gastritis—was the cause, given Fisher's "description of the pain and her account of the history."

Fisher then requested an ALJ hearing and submitted new evidence of her inability to work. First, she tendered doctors' reports showing that by January 2015, her leg pain had overtaken her abdominal pain as her chief complaint. Fisher continued to complain to Dr. Natarajan of numbness and "stabbing" pain in her legs, and she reported to a nurse practitioner between March and September 2015 that the pain kept her up at night. Dr. Natarajan characterized Fisher's sarcoidosis as "clinically stable," and tests showed its "complete resolution" during this period. Even so, Dr. Natarajan

also noted that Fisher was suffering from neuropathy caused by either diabetes or the history of sarcoidosis and mentioned medication options to treat "flare ups."

Fisher also submitted further medical opinions from Drs. Hazbun and Natarajan. Dr. Hazbun's letter opined that Fisher's "severe and chronic" sarcoidosis had affected her lungs, liver, bone marrow, and muscle, and had left her "permanently disabled and unable to work." Dr. Hazbun commented that Fisher's sarcoidosis, combined with her neuropathy, diabetes, sleep apnea, and hypertension, caused "daily pain" and prevented her from performing household duties. Meanwhile, Dr. Natarajan wrote that Fisher suffered from "systemic sarcoidosis" that caused "chronic, intermittent abdominal pain [and] fatigue that limit[ed] her daily activities" at home and at work. Moreover, Dr. Natarajan thought, Fisher's condition may cause her to need to take unscheduled breaks—depending on her fluctuating pain—and would cause her to miss work at least three days per month. Fisher's illness had warranted these limitations since 2012, Dr. Natarajan commented. Finally, Dr. Natarajan ticked the box indicating that Fisher's condition was "likely to produce 'good days' and 'bad days.'"

At a hearing before an ALJ in November 2015, Fisher testified that she stopped working at Cook Biotech in March 2014 because she began experiencing leg cramps that prevented her from standing for long periods. She further stated that she experienced ongoing liver pain that lasted all day "at least four times a week." She maintained that she was short of breath because of sarcoid lesions on her lungs, and she added that her sarcoidosis and neuropathy also caused leg pain and swelling. Plus, she continued, her medications made her drowsy.

As for her physical abilities, Fisher stated that she could lift five pounds, walk for less than half a block, and stand for five minutes and sit for only 15 minutes before needing to lie down. She lays down most of the day, napping "at least four times per day" for three to four hours on an average day. When the ALJ mused that this meant she slept 12 to 16 hours per day, Fisher confirmed that she did sleep this much on "some days." She also stated that she used her CPAP machine as prescribed to treat her sleep apnea. Finally, when the ALJ asked if Fisher had ever taken care of her grandchildren, Fisher reported, "my *oldest* grandchild is 18. So, I haven't taken care of her for a while." (Emphasis added.) The ALJ asked, "Is that all you want to say about that?" and Fisher said "Yes." In response to later ALJ questions, however, Fisher mentioned that it "bother[ed]" her that she could not "take care of" another grandchild who was two years old because her medical condition prevented her from bending to the floor or running after the child.

Following the five-step evaluation process, see 20 C.F.R. § 404.1520(a)(4), the ALJ concluded that Fisher did not have substantial gainful employment (step one); her diabetes, sarcoidosis, and right-hand carpal tunnel were severe when combined with her other diagnoses of chronic obstructive pulmonary disease, obesity, and sleep apnea (step two); and her impairments did not meet or medically equal a listing for a presumptively disabling condition (step three). The ALJ concluded that Fisher retained the residual functional capacity to perform "medium work," with the caveat that she had limited use of her left hand. In reaching his decision, the ALJ gave "great weight" to the opinions of state agency reviewing doctors Corcoran and Smartt. He found their conclusions that Fisher could perform "medium work" and lift up to 50 pounds "well supported" by Fisher's medical records; he characterized these records as showing she was "treated relatively infrequently," that "her sarcoidosis [was] considered stable," and that she "has had relatively normal examinations."

The ALJ discounted the opinions of Fisher's treating physicians, Drs. Hazbun and Natarajan. He explained that Dr. Hazbun's opinion that Fisher was "permanently disabled" was (1) "inconsistent with the objective medical evidence," (2) "not well supported," (3) "vague as to the claimant's limitations," and (4) "opine[d] on matters reserved to the Commissioner." Meanwhile, Dr. Natarajan's opinion—that Fisher's condition may cause her to take unscheduled breaks and frequently miss work—was "speculative" and "inconsistent with [Fisher's] relatively routine visits." The ALJ further reasoned that Dr. Natarajan's opinion would actually support the conclusion that Fisher can perform her past work because Fisher was "not off work" three days per month throughout the period to which Dr. Natarajan's opinion related (*i.e.*, November 2012 through March 2014).

The ALJ also discredited Fisher's testimony about the persistence and severity of her symptoms. First, he stated that although Fisher initially testified at the hearing that she slept 12 to 16 hours per day, she later admitted that she slept for 12 to 16 hours on only "some days." The ALJ also characterized Fisher as having first stated that she had not cared for her grandchildren in a long time, but having then later commented—inconsistently, in the ALJ's view—that she wished she could care for her two-year-old grandchild and that her physical therapy goals included squatting and kneeling to care for her grandchild. And, the ALJ commented, Fisher's statement at the hearing that she had stopped working because of her cramps also conflicted with treatment notes from April 2014 relating that she reported leaving her job for shortness of breath. Finally, although Fisher testified at the hearing that she used her CPAP machine as prescribed,

her medical records showed that she had been noncompliant and that a doctor had warned her of the accompanying risks as recently as October 2014.

Record evidence, the ALJ elaborated, belied Fisher's claims about her symptoms and ability to work. Although Fisher saw Dr. Hazbun for a sarcoidosis flare-up in early March 2014, Dr. Natarajan detected "no objective evidence of systemic sarcoidosis" two weeks later. The ALJ also opined that Fisher's acceptance of unemployment benefits in the second to fourth quarters of 2014 was "strongly indicative" that she was "able and willing to work during the adjudicative period," and that it "b[ore] greatly on her credibility" as to her physical limitations. The ALJ then summarized Fisher's medical records from between March 2014 and September 2015, concluding that "the claimant's nonsevere impairments cause[] some limitations … but no more than those assessed in the above [RFC] assessment."

The ALJ ultimately determined that Fisher could perform her past work as a chemical mixer, or new work as a production line worker, assembler, or custodian (steps four and five). The district court affirmed the ALJ's decision and upheld the denial of benefits.

**III**

We must uphold an ALJ's ruling if it is supported by substantial evidence, see 42 U.S.C. § 405(g), but that support is missing when the ALJ either fails to build a logical and accurate bridge between the evidence and conclusion or fails to follow the agency's own regulations in a way that likely bears on the outcome. See *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).

Fisher first challenges the ALJ's decision to discount the opinions of Drs. Natarajan and Hazbun. Given Fisher's filing date, the regulations entitle the opinions of her treating doctors on the nature and severity of her condition to controlling weight unless they are unsupported by medical findings or inconsistent with the record. See 20 C.F.R. § 404.1527(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (treating-physician rule applies only to claims filed before March 27, 2017, when the regulations changed prospectively). And even if "controlling" weight is not accorded to a treating physician's views, the ALJ must assign it a proper weight based on factors such as the length and nature of the physician-patient relationship. See § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018).

We begin with Dr. Natarajan, who opined that Fisher's condition would require her to miss up to three days of work per month and to take unscheduled breaks. The ALJ's reasons for rejecting Dr. Natarajan's opinion are unpersuasive. For example, the ALJ wrote that Dr. Natarajan's opinion was "inconsistent" with Fisher's "routine visits," but that conclusion lacks a solid foundation in the record. Between March 2014 (Fisher's alleged onset date) and September 2015, Fisher saw multiple doctors in an ongoing quest to treat her chronic abdominal, leg, and arm pain. And her pain from neuropathy, nerve damage, or gastritis persisted even after Dr. Natarajan noted that Fisher's sarcoidosis was "clinically stable." If anything, what was "routine" is that Fisher's doctors consistently detected flare-ups in her conditions.

The record squarely contradicts the ALJ's second reason for not deferring to Dr. Natarajan—that Fisher had been working without restrictions throughout the period that Dr. Natarajan addressed. Dr. Hazbun's treatment notes show that Fisher took up to eight hours of FMLA leave *per week* for doctor appointments beginning in September 2012. And she quit working entirely between October 2012 and March 2013 because of her sarcoidosis symptoms. Though she returned to her full-time job as a chemical mixer in July 2013, Fisher again stopped working in March 2014—the month of her alleged onset date—because of pain and shortness of breath. Because the ALJ discredited Dr. Natarajan's opinion based on a mischaracterization of the record, we cannot say that he articulated a logical link between the evidence and his conclusion.

The ALJ similarly erred in discounting Dr. Hazbun's opinion that Fisher's sarcoidosis is "severe and chronic." The ALJ relied on treatment notes from July to September 2015 reporting that her leg pain had improved, that she had a "rhythmic gait," and that her sarcoidosis was "clinically stable." But the ALJ ignored treatment notes from the same period clarifying that Fisher was nonetheless experiencing ongoing leg pain. This amounts to "cherry picking the medical record." See *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016). Compounding these errors, the ALJ failed to base the weight he assigned to the opinions of Drs. Natarajan and Hazbun on any recognized criteria, such as the nature and length of their relationships with Fisher. See § 404.1527(c)(2); *Kaminski*, 894 F.3d at 875.

Fisher also contends that the ALJ improperly discredited her testimony about the severity and persistence of her symptoms. We recognize that we may disturb the ALJ's credibility finding only if it is "patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). But that demanding standard is met here, because as we explain, the

record lacks support for two of the ALJ's main reasons for discrediting Fisher's testimony.

First, the ALJ's reliance on the fact that Fisher's pain abated for some time after her alleged onset date fails to appreciate the well documented fluctuating nature of her sarcoidosis. Fisher's doctors opined that she was likely to experience good days and bad days, but the ALJ focused exclusively on Fisher's good days. Recognizing that symptoms "may vary in their intensity, persistence, and functional effects," the agency has directed ALJs to review the record to identify possible explanations for a claimant's seemingly inconsistent experience of her symptoms. SSR 96-7p, 1996 WL 374186 (July 2, 1996) (superseded prospectively by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016)). These authorities show that the failure to address these fluctuations was a serious flaw. See *Cole*, 831 F.3d at 416.

Second, the ALJ's heavy reliance on Fisher's decision simultaneously to seek unemployment benefits and disability insurance is suspect. The ALJ clarified that his decision was not based "primarily" on Fisher's decision to seek both benefits, see *Cole*, 831 F.3d at 415; rather, he discredited her testimony about her symptoms because she simultaneously represented to the unemployment agency that she was seeking work. Even so, we have recognized that seeking work is not the same as actually working or being demonstrably able to work. Raw economic need can lead honest people to seek both types of benefits. In addition, the applicant may be genuinely unsure whether the agency in question will regard her as able to work, and so she may not know which type of benefit may be available for her, until she applies and learns what the agency thinks. *Cole*, 831 F.3d at 415; *Lambert*, 896 F.3d at 778–79.

This is not to say that ALJs can never consider the tension between what an applicant says in each of her dueling requests for benefits. See, *e.g.*, *Lambert*, 896 F.3d at 779. But this ALJ needed to address the plausible reasons why Fisher's representations in her different applications were or were not mutually consistent and honest. *Id*. at 778–79. An ALJ might think that *accepting* unemployment benefits is different from unsuccessfully seeking them. Perhaps that avenue could be explored on remand. But what the ALJ said here falls sort of "bear[ing] greatly" on Fisher's credibility or being "strongly indicative" of her ability to do more work than Fisher reported, as the ALJ thought.

We note in closing that some other inconsistencies that the ALJ perceived during Fisher's hearing testimony were questionable, but standing alone would not have merited reversal. For example, Fisher's testimony that she sleeps 12 to 16 hours only on

"some days" and her belated mention of her two-year-old granddaughter look more like additional information than like inconsistent accounts. And it goes without saying that her stated desire to care for her grandchild does not necessarily equate to an ability to do so. *Cf. Lambert*, 896 F.3d at 778. Finally, the ALJ was on stronger ground when he criticized Fisher for overstating her CPAP use. Treatment notes show that Fisher was indeed non-compliant at times and that a doctor warned her of the risks of that behavior in October 2014. But that is not enough to save the day for the Commissioner.

As the ALJ improperly rejected the opinions of Fisher's treating doctors and her own reported symptoms, he did not build an accurate and logical bridge between the evidence and his conclusion that Fisher is capable of working. We thus VACATE the judgment and REMAND the case to the agency for further proceedings.