**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 9, 2019
Decided July 23, 2019

*Before*

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-1192

| | |
|---|---|
| HOLLY DENISE GREEN, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Indiana, |
| | Fort Wayne Division. |
| *v.* | |
| | No. 1:17-cv-318 |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Susan L. Collins, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

**O R D E R**

Holly Green applied for Disability Insurance Benefits based on numerous conditions, including knee pain, fibromyalgia, neck and back pain, obesity, and anxiety. An administrative law judge denied benefits, finding that Green could do sedentary work with certain limitations. After the district court upheld this denial, Green appealed, arguing that the ALJ wrongly made an adverse credibility finding against her, improperly weighed the evidence, and did not adequately consider her sleep problems and neck pain. But the ALJ's findings were supported by substantial evidence and properly accounted for Green's limitations, so we affirm.

## I. Background

Green was 42 years old when she applied for benefits, asserting an onset date of December 2012. She has an associate degree in applied science and technology and has worked previously as a cook, welder, and in multiple positions in quality assurance. She is often in pain because she suffers from fibromyalgia, degenerative disc disease, migraines, obesity, and arthritis in her left knee and shoulder. She treats her pain with medication, including opioids like hydrocodone, and has received multiple nerve-blocking injections in her neck. In 2013, she had surgery on her right knee to treat a torn meniscus.

Doctors have also diagnosed Green with insomnia, sleep apnea, anxiety, and depression. For these conditions, Green takes Ambien, Prozac, and Xanax. Dr. Dan Boen, a consulting psychologist who performed a mental-status evaluation in connection with her disability claim, assigned her a Global Assessment of Function ("GAF") score of 45, indicating that she had serious impairments in social and occupational functioning.[1] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994). Dr. Boen also opined that Green "could understand what she was asked to do on a job but she would not be able to remember it. She would have trouble concentrating and staying on task."

State-agency consulting psychologist Dr. Ken Lovko reviewed Green's records and determined that Dr. Boen's opinion was "not supported by exam" or daily-life activities. He opined that she could "understand, remember and carry-out semiskilled tasks" and "attend to task[s] for sufficient periods of time to complete" them. Green's internist, Dr. Vijay Kamineni, noted that she had "[n]ormal concentration and social interaction," and her "[r]emote and recent memory" was "intact."

After the Social Security Administration denied Green's application, she had a hearing before an ALJ. She testified that she was unable to work primarily due to her left knee pain, fibromyalgia, and neck problems. Green said she that she is in debilitating pain about half the time and that on "bad days" she lies down and tries not to move. She also testified that she could stand only 15 to 20 minutes at a time. She told

---

[1] The GAF, which assesses an "individual's overall level of functioning," *Craft v. Astrue*, 539 F.3d 668, 676 n.7 (7th Cir. 2008), is no longer widely used by psychiatrists and psychologists.

the ALJ that a recent MRI showed "bulging disc[s]" in her neck and back. Neck pain causes her "difficulty looking side-to-side," "looking just slightly down at a computer screen or a table," and "holding something and reading." She suffers from social anxiety as well—she said she cannot handle being in a room with more than ten unfamiliar people. She also reported that some days she "just can't … think straight."

When discussing her daily routine, Green said that she reads the newspaper (though she usually lies down after she finishes it), watches half-hour television programs, and goes on Facebook every couple of days. She also enjoys fishing, though she has not gone for over six months. She can take care of her own hygiene, and although her daughter usually helps her with the cooking, Green said she does a few household chores, like dusting, grocery shopping, and folding laundry. Because she does not sleep well, Green testified that she takes "about a two hour nap" every day.

The ALJ consulted a vocational expert (VE) about whether a person with Green's functional limitations could find work in the national economy. In his first hypothetical, the ALJ asked about an individual of Green's age, education, and work history, "reduced to sedentary work" with the following limitations: never lifting more than ten pounds; sitting six hours of the work day; limited to "simple repetitive tasks," with "no sudden or unpredictable workplace changes," no "tasks requiring intense or focused attention for prolonged periods," and the ability to "work at a flexible pace where the employee is allowed some independence in determining either the timing of different work activities or pace of work." The expert said that such a person could work as an order clerk, change account clerk, or call-out operator. Next, the ALJ added the limitation of needing to alternate "between sitting and standing up to every 30 minutes," and the VE responded that the same jobs would be available.

After the hearing, Green provided additional evidence regarding her cervical spine issues and sleep apnea. This included the analysis of the 2015 MRI mentioned in Green's testimony; it showed "[d]egenerative disc changes with" two small central disc protrusions. Doctors also recorded that Green's "bilateral neck pain and spasms have been getting worse" and that she had "difficulty in turning her head."

The ALJ then conducted the Administration's five-step analysis, *see* 20 C.F.R. § 404.1520(a), § 416.920(a). At Step 1, he determined that Green had not engaged in substantial gainful activity since December 4, 2012. At Step 2, he identified Green's severe impairments as fibromyalgia, bilateral knee pain due to osteoarthritis and a meniscal tear requiring surgery, neck (and related headache) pain and low back pain

due to cervical and lumbar degenerative arthritis, rosacea, obesity, depression, and anxiety. At Step 3, the ALJ concluded that these severe impairments did not meet any listings for presumptive disability. Further, the ALJ determined, Green's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."

Between Steps 3 and 4 the ALJ determined that Green had the Residual Functioning Capacity (RFC) to perform sedentary work with the limitations he had included in his hypothetical questions to the VE. Though the ALJ determined that Green's limitations precluded her from performing her past relevant work (Step 4), at Step 5 he relied upon the VE's testimony and concluded that with her RFC, Green could successfully find other work.

The agency's Appeals Council denied Green's request for review. She then sought judicial review, and the parties agreed to have a magistrate judge adjudicate the case. *See* 28 U.S.C. § 636(c). The magistrate judge upheld the ALJ's decision.

## II. Analysis

"An ALJ's decision will be upheld if supported by 'substantial evidence,' which means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014)).

### A. ALJ's Credibility Determination

Green first challenges the ALJ's credibility determination because, she says, the assessment rests on an incomplete review of her daily activities, misinterprets her response to treatment, and is not supported by the medical evidence. Specifically, she argues that the ALJ illogically found that "her activities of daily living show that she is functioning at a higher degree than she reported," and that the ALJ did not consider the daily assistance that she receives from her family. We must determine whether the ALJ's credibility finding was supported by the record, recognizing that an ALJ's credibility determination is entitled to "special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).

Here, the record supports the ALJ's credibility determination. ALJs are tasked with reviewing the evidence provided and assessing whether a claimant is exaggerating the effects of her impairments, and reviewing daily-living activities is an important part of that evaluation. *See* 20 C.F.R. § 404.1529(c)(3)(i); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016); *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) (agreeing with ALJ's reasoning that claimant's daily activities undermined testimony about severity of symptoms). Here, there is no evidence that the ALJ overstated Green's ability to perform daily activities. He noted that Green was able to do only some household chores (help prepare meals, fold laundry, and grocery shop). He then evaluated Green's daily activities against her asserted impairments and found that she overstated the intensity of her symptoms. Her engagement in these activities showed that, with some limitations, she could do some work. *See Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). And though it is true that ALJs should not equate activities of daily living with an ability to engage in full-time work, *see, e.g., Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012), there is no evidence that the ALJ did so here. Rather, he used what he heard from Green—that she cannot be active, that she needs to alternate between sitting and standing, and that she cannot lift heavy items (like laundry)—to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified. This was not "patently wrong." *Pepper*, 712 F.3d at 369; *Powers*, 207 F.3d at 435.

Green's next argument, that it was unfair for the ALJ to find her testimony not credible by pointing to her positive response to treatment, is also uncompelling. The ALJ discredited Green's account of her symptoms in part because the medical records showed that Green's "fibromyalgia was noted for being well controlled," and that her knee surgery produced "good results." Green asserts that her testimony undermines this, especially because she said her pain causes her to have "bad days" about half the time and that her knee had been acting up recently. The medical evidence, however, supports the ALJ's statements. Green repeatedly reported improvements in both her fibromyalgia and knee pain (records stated, "She does have fibromyalgia which is generally well controlled with Neurontin," and "left knee improving since arthroscopy"). And an ALJ is permitted to consider the effectiveness of treatment, including surgery, in making his credibility determination. *See* 20 C.F.R. § 404.1529(c)(3)(iv); *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018).

Because the ALJ's judgment of Green's credibility "was tied to evidence in the record and was not patently wrong, we may not disturb it." *Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016).

B. ALJ's evaluation of Dr. Boen's opinion

Green next argues that the ALJ gave too little weight to consulting psychologist Dr. Boen's opinion. He gave "some weight" to Dr. Boen's opinion that Green could not remember directions and would "have trouble concentrating and staying on task," but "little weight" to his GAF assignment.

The ALJ adequately explained his reasons for discounting Dr. Boen's opinion. An ALJ may discount a doctor's opinion for reasons that are supported by the record. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)-(3)). Here, the ALJ reviewed the entire mental-health record, finding multiple reports that showed that Green sometimes reported normal concentration and memory function. He also discussed why he did not credit the GAF score—he said that the GAF is a subjective test that can differ from one clinician to another, *see, e.g., Price*, 794 F.3d at 839, and explained that the "objective medical evidence shows that [Green] is functioning at a higher level than a GAF of 45 suggests." The ALJ instead gave "great weight" to Dr. Lovko's opinion, which expressly disagreed with Dr. Boen's, saying that it was "not supported by exam or" activities of daily life. When "consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).

And in addition to looking at the report of Dr. Kamineni (Green's internist), the ALJ also discussed Green's anxiety diagnosis and treatment, noted that medical records showed that she was "cooperative and calm" and had "normal behavior, judgment and thought content," and credited state-agency psychological consultants' opinions that she had "mild limitations with activities of daily living … and moderate limitations with concentration, persistence and pace." Substantial evidence thus supported the ALJ crediting other medical evidence over Dr. Boen's opinion. *See Schmidt v. Astrue*, 496 F.3d 833, 841–42 (7th Cir. 2007).

C. ALJ's evaluation of Green's sleep problems and neck pain

Last, Green argues that her RFC is incomplete because it does not account for her sleep apnea, cervical spine impairment, or mental-health limitations. But the ALJ acknowledged these impairments—albeit at different levels of specificity—and accounted in the RFC for the functional limitations that they could cause. This was

enough; an ALJ need not discuss every piece of evidence in the record. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

First, it is clear that the ALJ did consider Green's problems sleeping. Green contends that the ALJ did not consider her sleep apnea and other problems with sleep and next-day fatigue; however, the ALJ sufficiently addressed the limitations supported by objective medical evidence. The ALJ noted that Green had moderate difficulties with concentration, persistence, or pace, and discussed her difficulties with focus and concentration. In the RFC, he limited Green to sedentary work, with the additional mental limitations that Green "cannot understand or carry out detailed instructions" and "cannot perform tasks requiring intense/focused attention for prolonged periods." The RFC does not mention that Green naps for two hours every day, but this requirement is not supported by evidence other than her testimony, which the ALJ did not credit. At most, the medical records say that she will experience "daytime sleepiness or drowsiness" and cautions Green from operating a motor vehicle or engaging in other activities that are hazardous "in the presence of diminished alertness"—limitations for which the RFC accounts. Moreover, Green did not elicit testimony from the VE about how a need to nap would affect her job prospects. Neither Green nor the record specifies how sleep problems impaired her ability to work beyond what was included in the RFC, so there is no reversible error. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).

Although the question whether the ALJ adequately considered Green's neck pain is thornier, substantial evidence nonetheless supports the ALJ's decision. As Green points out, significant medical evidence showed that her neck pain caused headaches and tingling, and one medical report, submitted after the hearing, showed that this pain made it difficult for her to turn her head from right to left. Green specifically notes that, although the RFC limits her to not lifting more than ten pounds and not sitting for more than six hours a day, it does not expressly include a limitation related to her inability to turn her head or look down. Yet the ALJ *did* consider Green's neck problems: he listed them as a serious impairment, mentioned her testimony about her recent MRIs, and acknowledged her testimony that reading a newspaper or going on the computer can aggravate her neck pain. As required, the ALJ considered the entire record when creating the RFC. *See Schmidt*, 496 F.3d at 845.

Finally, Green argues that in assigning mental limitations in the RFC, the ALJ simply "split the difference" between different mental-health professionals' opinions. This is not accurate. The ALJ reviewed all the mental-health evidence, explained why he

assigned different weight to the different opinions, and generated an RFC that adequately captured Green's mental limitations. Green offers no specific criticisms of the mental RFC, so we find no reversible error. *See Jozefyk*, 923 F.3d at 498.

### III. Conclusion

Because the ALJ's findings were adequately supported and properly accounted for all of Green's limitations, we AFFIRM.