> **NONPRECEDENTIAL DISPOSITION**
> To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Submitted January 7, 2019[*]
Decided August 8, 2019

**Before**

DIANE P. WOOD, *Chief Judge*

DIANE S. SYKES, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 18-2138

| | |
|---|---|
| TYLER M. ROCKWELL, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 17-C-373 |
| ANDREW M. SAUL, Commissioner of Social Security, *Defendant-Appellee*. | William C. Griesbach, *Chief Judge*. |

## O R D E R

Tyler Rockwell, a 27-year-old with epilepsy, appeals from the district court's decision to uphold the Social Security Administration's denial of his application for supplemental security income. Rockwell challenges the assessment of his residual functional capacity, contending that the administrative law judge (ALJ) improperly

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

discredited his treating and examining physicians' opinions that his symptoms would require him to take frequent breaks and miss several days of work per month. Because we agree that the ALJ failed to support his decision to discount the opinion of Rockwell's primary care physician, we vacate the judgment and remand for further proceedings.

## I

Rockwell saw Dr. James Napier, a neurologist, in January 2011, reporting that he had suffered a grand mal seizure during which he lost consciousness, collapsed, and experienced violent muscle contractions. He was 19 years old at the time. Rockwell had experienced a seizure once before, when he was six years old. Dr. Napier prescribed a medication to prevent seizures, and Rockwell remained episode-free until August 2012, when he suffered two grand mal seizures in a two-week period. One occurred in Dr. Napier's office, and the doctor reported that Rockwell "was postictal [*i.e.* his consciousness was impaired] for about five minutes" afterward. Dr. Napier responded by increasing Rockwell's dosage.

During the same period, Rockwell had regular visits with Dr. Glenn Smith, his primary care physician. In January 2012, Dr. Smith noted that Rockwell's "seizure disorder" was under control with his current medications. In treatment notes from a follow-up visit the next month, he noted that a 2011 MRI scan showed cysts on Rockwell's brain, and that Rockwell had experienced petite mal or "absence" seizures— 10- to 15-second episodes in which he would lose awareness and stare off.

In 2013 Rockwell's seizures became more frequent. He told Dr. Napier in February that he had suffered three grand mal seizures since the end of December. Dr. Napier again increased Rockwell's dosage, but Rockwell visited the emergency room twice more that month for seizures. He then had no episodes until June, when he had a seizure while playing basketball, fell, and lost two teeth on impact.

A month after this incident, Rockwell applied for supplemental security income, alleging that he was disabled based on his epileptic seizures and that his onset date was March 1, 2011. He alleged that he had no memory of his grand mal seizures after they occurred, and that he experienced memory loss "on a daily basis" after his seizures became more frequent in 2013. Rockwell also stated that he suffered from absence seizures. He maintained that he rarely left the home out of fear that he would have a grand mal seizure, that basic tasks such as grocery shopping were difficult because of his memory loss, and that he relied on his mother (with whom he lived) to "help him with most things."

The agency consulted Dr. Stacey Soeldner, a psychologist, who tested Rockwell to determine how his seizures "may have impaired his functioning." In an October 2013 report, she diagnosed him as suffering from grand and petite mal seizures, noting that there was no known trigger. Dr. Soeldner reported that Rockwell often did not remember a seizure after it happened and that it took him "days to recover." Dr. Soeldner also opined that Rockwell had a "marked limitation" in his "concentration, attention, and work pace" because he could not "stay focused for more than a few minutes before he needed directions repeated." Finally, she reported that memory tests indicated that he had a hard time "encoding and retrieving information when it is immediately presented to him."

After reviewing Rockwell's medical records and Dr. Soeldner's evaluation, a consulting state agency doctor, Jack Spear, opined that Rockwell could perform unskilled work. He disagreed with Dr. Soeldner's evaluation of Rockwell's memory and attention span; Rockwell's only limitation, he thought, was that Rockwell should avoid heights and other hazards that would be dangerous if he had a seizure. The agency denied Rockwell's application for benefits in October 2013.

That same month, Dr. Smith (the primary care physician) noted that Rockwell was "still having seizures" despite his medications and was "requiring more or less constant surveillance." Rockwell's neurologist referred him to Dr. Jeffrey Britton, a Mayo Clinic neurologist. Dr. Britton reported in his treatment notes in mid-November 2013 that Rockwell had suffered two grand mal seizures in the previous three weeks and that he also had smaller seizures during which he would stare off for short periods. He also noted that if Rockwell's seizures were occurring one or two times per month, that "he couldn't reassure an employer that it wouldn't happen at the worksite." Evaluating Rockwell over two visits, Dr. Britton prescribed Keppra to help control the grand mal seizures. He noted that this new medication may cause somnolence— drowsiness or sleeping for unusually long periods of time.

After Dr. Britton changed Rockwell's medication, his condition stabilized: he suffered no grand mal seizures after December 2013. But in annual appointments with Dr. Smith between 2013 and 2016, he reported chronic fatigue, memory loss and the need to lie down frequently. Dr. Smith attributed these symptoms to "brain damage" related to his previous grand mal seizures. Dr. Smith had also reported in treatment notes in 2015 that Rockwell continued to experience "occasional" absence seizures.

Alleging that his memory had worsened since the August 2013 seizures and that his medication made him "very tired," Rockwell asked the agency to reconsider his disability claim in December 2013. It did so. Agency psychiatrist Dr. Larry Kravitz

concluded, based on his review of Dr. Soeldner's reports, that Rockwell could remember and follow simple, repetitive instructions. Acknowledging that Rockwell had difficulty encoding new information, Dr. Kravitz nonetheless determined that the records showed that "once having encoded information into memory," Rockwell had "fair ability to remember" it. Thus, he concluded, Rockwell could likely perform rote tasks. The agency accordingly denied Rockwell's application on reconsideration.

## II

Rockwell then requested a hearing, at which he submitted new evidence to support his inability to work. First, he proffered a June 2014 physical-capacities report in which Dr. Smith opined that, if employed, Rockwell would need one or two unscheduled breaks during an eight-hour work day to lie down and would "frequently" miss work because of his symptoms. Next, he tendered a 2016 report from Kristine Twomey, a treating neurologic nurse practitioner, who opined that Rockwell's "cognitive dysfunction" would make it "exceedingly difficult" for him to keep a job. Finally, Rockwell submitted a report from Dr. Julie Bobholz, a psychologist whom he consulted in connection with his SSI application. She examined him in January 2016. Based on neurophysical tests, interviews with Rockwell and his mother, and a review of his medical history, Dr. Bobholz reported that Rockwell's "memory for spatial information" had declined since 2012. She noted that he exhibited a cognitive deficit that was likely related to "his seizure disorder but also likely related to some developmental issues," and that caused "impaired processing speed and executive functions." Based on these findings, Dr. Bobholz opined that Rockwell "would struggle in most work situations." She also checked boxes on a recommendation form indicating that, if employed, Rockwell would be "seriously limited" or "unable" to maintain focus for two hours straight and would need more than five days off per month.

At the hearing, the ALJ called as experts a physician and two psychologists. Physician Dr. Sheldon Slodki testified that nothing in Rockwell's medical record indicated that he had physical limitations between seizures. Psychologist Dr. Terry Shapiro testified that Rockwell's neurophysical test results showed no "marked limitations" in his ability to work; and psychologist Dr. Cremerius testified that Rockwell could understand only simple, repetitive instructions. Dr. Cremerius also said that Rockwell's concentration deficits did not limit his ability to learn a new job.

Next, the ALJ heard testimony from a vocational expert (VE). He asked the VE whether jobs existed in the national economy for someone possessing the restrictions that Drs. Slodki, Shapiro, and Cremerius described. Specifically, he described a hypothetical candidate who could not climb "ladders, ropes or scaffolds," should avoid

"hazards" and "driving," could understand and remember only "simple instructions" and carry out only "simple routine tasks." He further limited the options to jobs that were "not fast-paced," did not require more than "incidental public contact" and "occasional contact with coworkers." The VE answered that someone with those restrictions could work as a laundry laborer, housecleaner, or final assembler in a factory.

Following the five-step evaluation process, see 20 C.F.R. § 416.920(a)(4), the ALJ concluded that Rockwell did not have substantial gainful employment (step one); his seizures were severe (step two); and his impairment did not meet or medically equal a listing for a presumptively disabling condition (step three). The ALJ then assessed Rockwell's residual functional capacity and concluded that he could still perform some sedentary to moderate-level, repetitive work, except that he could not climb ladders or drive, which could be dangerous if he suffered a seizure. In reaching his decision, the ALJ discredited Dr. Smith's determinations that Rockwell had brain damage, and that, if employed, Rockwell would need frequent breaks and miss work frequently because of his symptoms. Commenting that treating physicians "have an ethical obligation to be supportive of their patients," the ALJ concluded that Dr. Smith had simply parroted the symptoms that Rockwell reported instead of basing his prognosis on objective medical evidence, such as imaging tests of his brain. Also discrediting Dr. Smith, the ALJ noted, was his report that Rockwell's "level of dysfunction had existed 'since birth.'" Finally, the ALJ also cited Dr. Smith's lack of specialization, the fact that he had not mentioned functional limitations in treatment notes from September 2015, and the opinions of Drs. Smith and Britton that Rockwell currently experienced absence seizures, not grand mal seizures, as bases for discrediting Dr. Smith's prognosis in the physical capacities form.

The ALJ also gave no weight to Dr. Bobholz's corroborating opinion that Rockwell would need at least five days off work per month because of his fatigue. He did so because he thought that Dr. Bobholz had provided no basis for that view. Relying instead on the opinions of agency experts Drs. Spear (a reviewing physician) and Kravitz (the reviewing psychiatrist), the ALJ ruled that Rockwell could complete repetitive work with certain limits. After concluding that Rockwell had no past relevant work (step four), the ALJ credited the vocational expert's testimony that Rockwell could be a laundry laborer, cleaner/housekeeper, or final assembler (step five). The Appeals Council denied Rockwell's request for review, and at the first step of judicial review, the district court granted the Commissioner's motion for summary judgment and upheld the denial of benefits.

**III**

On appeal, Rockwell challenges the ALJ's decision to rely on "the opinions of state agency consultants instead of [his] main doctors who have documented [his] illnesses." Rockwell mentions Drs. Soeldner and Bobholz by name, and we also understand him to assert, as he did in the district court, that among his "main" treaters whose opinions the ALJ improperly discredited were Dr. Smith and Nurse Practitioner Twomey. See *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017) ("[W]e … construe *pro se* filings liberally, and will address any cogent arguments we are able to discern …. ").

Before discussing the merits of his appeal, we note that Rockwell's initial brief appeared to have been authored by his mother, a non-lawyer. We asked him to submit a signed letter to the court either adopting or rejecting that brief. He responded with a letter dated February 28, 2019, and docketed on March 6, confirming that he personally prepared the brief with his mother's help and that it is his brief. It is therefore properly before us.

We uphold an ALJ's ruling if substantial evidence supports it. See 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Our review is limited to the reasons that the ALJ articulates in his written decisions. *Jelinek*, 662 F.3d at 811. Since Rockwell filed his application before March 27, 2017, the opinions of his "main," or treating, doctors on the nature and severity of his condition are entitled to controlling weight unless they are unsupported by medical findings or inconsistent with the record. See 20 C.F.R. § 416.927(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (treating-physician rule applies only to claims filed before March 27, 2017). An ALJ may not reject the controlling weight of a treating physician's opinion without giving a "sound explanation." See § 416.927(c)(2); *Jelinek,* 662 F.3d at 811. Even if the ALJ concludes that controlling weight is not called for, he still must determine what weight to give the medical opinion based on factors including the length and nature of the physician-patient relationship. See *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018).

We agree with Rockwell that the ALJ improperly discounted Dr. Smith's opinion. Although the ALJ gave reasons for doing so—including his belief that treating physicians often lie about their patients' symptoms in reports to the Social Security Administration, his disbelief of Dr. Smith's report that Rockwell had experienced his symptoms "since birth," Dr. Smith's lack of specialty, and the doctor's failure to describe functional limitations in his treatment notes—these "reasons" were unsound. First, the ALJ's notion that treating physicians such as Dr. Smith lie about their patients' capabilities is based on nothing but speculation and a general suspicion of treating

physicians. Nothing in the record backs this up. See § 416.927(c)(2). To the contrary, there was evidence corroborating Dr. Smith's assessment that Rockwell would need to take frequent breaks and to miss work often because of his symptoms, including the opinions of Dr. Bobholz, an examining physician, and treating Nurse Practitioner Twomey. The ALJ's inconsistent treatment of Dr. Bobholz's report (which the judge largely credited apart from the doctor's assessment of Rockwell's functional limitations), and his failure to discuss Twomey's finding at all, leave us without any sign that the ALJ assessed Dr. Smith's opinion in light of the whole body of medical evidence. Worse, the ALJ mischaracterized Dr. Smith's report. Dr. Smith wrote that Rockwell had experienced epileptic "symptoms … since birth"—something the record does not contradict—not, in the ALJ's words, that his current "level of dysfunction" had existed his whole life.

Dr. Smith's failure to mention in his treatment notes the limitations he included in his physical capacities report does not imply that Dr. Smith exaggerated in the latter. No medical source opined that such limitations were inconsistent with Rockwell's condition. See *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). Indeed, it seems that the ALJ set up a catch-22 for the primary care doctor: wrong to say nothing about those limitations, and wrong to address them. If Dr. Smith had set forth specific *functional* limitations in his treatment notes, the ALJ would have discredited them as biased or as not within the doctor's province, see *e.g.*, *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). Yet the ALJ found that Dr. Smith was not credible because he failed to assign functional limitations in his treatment notes. The agency regulations applicable to Rockwell's case entitle treating physicians' opinions to more, not less, weight, to the extent they are supported. See § 416.927(c)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). At the same time, a treating physician must take care to provide and document only medical care and to steer clear of a patient's work-related restrictions, which are for the ALJ unless the ALJ asks the doctor to address the matter.

The ALJ also erred in concluding that doctors' observations that Rockwell experienced only absence seizures were a valid basis for discrediting Dr. Smith's prognosis. The ALJ seems to suggest that only grand mal seizures, not absence seizures, lead to the type of limitations that Dr. Smith described. But this conclusion is unsupported: Drs. Smith and Bobholz, as well as Nurse Practitioner Twomey, recommended physical limitations based on cognitive dysfunctions *resulting* from his previous grand mal seizures. They did so, moreover, with the knowledge that Rockwell's medication controlled his grand mal seizures, but that he continued to experience absence seizures. Thus, the ALJ erred in concluding that only grand mal seizures could explain Rockwell's claimed functional limitations (such as the need to

rest frequently) because "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert*, 896 F.3d at 774.

## IV

Because the ALJ improperly rejected the opinions of Rockwell's long-time treating physician, he failed to "build an accurate and logical bridge between the evidence" and his conclusion that Rockwell is capable of working. See *Lambert,* 896 F.3d at 774 (internal quotations omitted). Dr. Smith's records and opinions constitute a significant part of Rockwell's treatment records. We cannot be sure, considering the absence of strong contradictory evidence, that the result would have been the same if the ALJ had properly evaluated them. Thus, the error is not harmless, *United States v. Andreas*, 216 F.3d 645, 658 (7th Cir. 2000). We therefore VACATE the judgment and REMAND for further proceedings.